# CHARLESTON.

## ZOUCH v. CHES. & OHIO R'Y CO.

Submitted January 19, 1892—Decided April 16, 1892.

1. COMMON CARRIER—NEGLIGENCE—RAILROAD COMPANIES—BAILMENT.

A common carrier may, by special agreement, just and reasonable in itself, and fairly made between it and the consignor of a horse at the time of shipment, fix the value of such horse, upon consideration that the rate of charges for transportation shall be commensurate with the value of the horse thus ascertained, and may also limit its liability in case of loss to the amount thus agreed upon, even though the loss may be the result of negligence on the part of the carrier, provided said negligence be not gross, wanton or willful; but it can not wholly exempt itself from liability for loss resulting from negligence.   (p. 534.)

2. COMMON CARRIER—NEGLIGENCE—RAILROAD COMPANIES—BAILMENT.

A common carrier is entitled to be fairly informed as to the value of the property confided to his care; and where a shipper enters into an agreement with a carrier as to the value of the property shipped, and receives the benefit of low rates by reason of placing a low valuation upon the property, he is estopped from claiming or recovering another and higher valuation after the loss occurs, although said loss may be the result of negligence on the part of the carrier, provided the same is not gross, wanton, or willful.   (p. 537.)

ENGLISH, J., makes the following statement of the facts of the case:   On the 16th day of June, 1890, H. J. Zouch brought an action of trespass on the case in the Circuit Court of Cabell county against the Chesapeake & Ohio

Railway Company, claiming one hundred and seventy five dollars damages by reason of the loss of a certain horse which was delivered to the defendant, as a common carrier, to be safely carried from the city of Huntington to Brownstown, which horse was alleged to be of the value of one hundred and seventy five dollars, and to have been lost by the carelessness and negligence of the defendant. The defendant pleaded not guilty, a jury was waived, and the matters in issue were submitted to the court; said court finding for the plaintiff, and assessing his damages at one hundred and seventy five dollars, and rendering judgment for that amount, to which ruling and judgment of the court the defendant excepted, and tendered its bill of exceptions which contains the following agreed state of facts, to wit:

"That on November 27, 1889, the plaintiff, H. J. Zouch, had shipped one bay mare by J. A. Hughes, his agent, to S. S. Vinson, of Brownstown, W. Va., which contract of shipment or bill of lading is hereto attached, and made part of the agreed state of facts, and the plaintiff, H. J. Zouch, was the owner of said mare mentioned in this bill of lading, and that the said J. A. Hughes made said shipment for him; that the actual cash value of said mare was one hundred and seventy five ($175.00) dollars; that the freight train upon which the mare was shipped went through the Guyandotte bridge across Guyandotte river, and the mare was killed in the wreck between Huntington and Brownstown, and was never delivered to the consignee, nor has the consignee or the owner, the plaintiff in this case, ever received any compensation for the loss of said mare; that there was no representative of the owner of the stock on the train or in attendance when the mare was killed, and claim for said loss was duly made in writing, within ten days of its occurrence, to the general freight agent of the defendant, which claim was disallowed and not paid by the defendant; and that if the horse had been shipped at full rate the freight upon the horse would have been seven dollars, and that upon the valuation of one hundred dollars the freight was three dollars and twenty five cents."

The bill of lading was attached to said agreed statement of facts, and reads as follows:

"(Form 266 F.)   Chesapeake & Ohio Railway Company. Live-Stock Contract.   Huntington Station, Nov. 27, A. D. 1889.   When stock is from river points, agent at Huntington will fill in the number of the cars into which it is loaded.   It is hereby agreed by and between the Chesapeake & Ohio Railway Company, party of the first part, and J. A. Hughes, party of the second part, that the party of the first part will carry live stock without limiting its liability by contract, at its regular tariff rates, and that it will forward the same at greatly reduced rates where certain risks, duties, and liabilities are assumed by shippers, as hereinafter specified.   It is further agreed that in the present instance the party of the second part elects to avail himself of the reduced rate, and has delivered on the cars of the party of the first part the following described live stock, to wit:

| Consignee and destination. | Description of stock, | Car Nos., Wt. |
|---|---|---|
| S. S. Vinson, Brownstown, W. Va., | 1 gray horse, 1 bay mare, | 3,000 |
| Care— Mr. Meadows. | 2 saddles and bridles. (Released.) | 100 |
| Charges, $——. | | |

(Original.)          C. & O. 2798.

"And in consideration of the same being shipped, and the person in charge thereof being carried on the terms and conditions hereinafter mentioned, the party of the first part agrees to forward the same as far as its line extends towards or to point of destination, and there deliver same to the consignee or the next carrier in the route, and guaranties that the freight thereon, from point of shipment to destination, shall not exceed the reduced rate of 25c. per 100 ℔s., and agrees to carry free on the train with said stock, to take care of same, the persons below named as in charge thereof, not to exceed one for one or two cars, two for three or four cars, and three for five or more cars, at their own risk of personal injury, except when caused by the gross negligence or willful misconduct of the party of

the first part in forwarding the train with said stock; this contract entitling them to ride on the train carrying said stock only. In consideration of which the party of the second part agrees that he will load and unload said stock at his own risk and expense, take the entire care and control of same on the trip, feed and water the same at his own risk and expense, in case of delay from any cause whatever, and at proper intervals on the route see that the cars are in good condition, properly loaded and securely fastened, and that he does and will assume all risk, and agrees that party of the first part shall not be held responsibe for any loss or damage which may occur in loading, forwarding, or unloading said stock, either from overloading, heat, suffocation, disease, weakness, getting down or injured or killed in the cars, viciousness, injuring or killing each other, want of care, food, or water, remaining too long in the cars, escapes from any cause, delays caused by fire, storms, obstructions of tracks, broken rails, failure of machinery or cars, want of fuel or water, or any other cause incident to railroad transportation, except fraud or gross negligence in forwarding the particular cars in which said stock is loaded. Intending hereby to engage the party of the first part to forward said stock over its road, but not to hold it responsible in any manner for the care or safety thereof, or of the persons traveling therewith, unless arising from fraud or gross negligence, as above specified. The party of the second part further agrees, for the consideration aforesaid, that he will in no event hold the party of the first part responsible for any loss, damage, or injury whatever to said stock which may occur beyond its own line, and in case of any loss or damage on its line, for which the party of the first part may be responsible under this contract, such responsibility shall be and is hereby limited to $100 for each horse, mule, stallion, or jack, $50 for each cow, steer, or bull, and $20 for each other animal, whether such loss or damage exceeds such sums or not; and all loss and damage which may occur to said stock, from whatever causes, for which claim is not made in writing within ten days of its occurrence, to the general freight agent of the party of the first part, is hereby re-

leased and forever discharged. The party of the second part further agrees that he fully understands and assents to the terms of this contract, and that the same shall apply to each and every one of the carriers in the route to destination. In witness whereof the parties hereto have hereunto set their hands and seals in duplicate, the day and year above written.

> "Chesapeake & Ohio Railway Company.
> "By C. W. Hunter, Agent.        [Seal.]
> "J. A. Hughes, Owner & Shipper.   [Seal.]"

The court, having considered the case and the facts, and the law arising thereon, was of opinion that the plaintiff was entitled to recover the full amount claimed by him, one hundred and seventy five dollars, found for the plaintiff, and assessed his damages at said amount; and the defendant moved the court to set aside its finding because the same was contrary to the law and the evidence, which motion the court overruled, and the defendant excepted. The defendant also asked that a new trial be granted it, which the court refused. The defendant again excepted, which exceptions were properly saved to it, and judgment was rendered against the defendant for said amount; and from this judgment this writ of error was obtained.

*Simms & Enslow* for plaintiff in error cited Wheel. Mod. Carr. pp. 114 *et seq.*; 112 U. S. 331; 86 Va. 481; 20 Atl. Rep. 327; 84 Ala. 178; 69 Ill. 62; 144 Mass. 284; 137 Mass. 33; 98 Mass. 239; 74 Mo. 538; 70 N. Y. 410; 120 Ind. 73; 28 O. St. 144; 55 Wis. 319; 31 Minn. 85.

*Vinson & McDonald* 112 U. S. 331; 26 Barb. 641; 32 Md. 333; 144 Mass. 284; 26 Gratt. 328; 14 W. Va. 180; 46 N. W. Rep. 333; 16 S. W. Rep. 102, 178, 182, 441, 803; 14 S. W. Rep. 311; 24 N. E. Rep 417; 38 Mo. App. 408; 7 Atl. Rep. 134; 19 Atl. Rep. 702; 7 So. Rep. 547; 41 N. W. 998; 17 Wall. 337; Redf. Carr. § 156; Sto. Bailm. § 571; 14 W. Va. 180; Id. 191; Id. 203.

English, Judge:

The question presented for our consideration and determination in this case is whether a railroad company

operating in this State, and carrying on business as a common carrier, can by a special contract made with a shipper of live stock fix the value of the property to be shipped, and ascertain beforehand the amount of damages that is to be paid in the event of the loss of the property, when the rates of charges for transportation are fixed by the same agreement in accordance with the value placed by the owner or shipper upon the animal shipped, or whether a shipper has a right to fix one value upon his property at the time he is making the shipment, in order to get the advantage of reduced rates, and place another value upon his property when he claims damages for its loss or destruction.

The portion of the agreement signed by the shipper which is material in this case reads as follows:

"The party of the second part further agrees, for the consideration aforesaid, that he will in no event hold the party of the first part responsible for any loss, damage, or injury whatever to said stock which may occur beyond its own line; and, in case of any loss or damage on its line for which the party of the first part may be responsible under this contract, such responsibility shall be and is hereby limited to one hundred dollars for each horse,  *   *   *   * whether such loss or damage exceeds such sum or not."

It appears from the agreed statement of facts, that the freight train, upon which the mare was shipped, went through the Guyandotte bridge across Guyandotte river, and said mare was killed in the wreck between Huntington and Brownstown. Whether the wreck was the result of inevitable accident or negligence on the part of the defendant does not appear; but the rule has been laid down, that, where a loss of this character appears, the presumption is that it was caused by negligence, and the burden of proof is on the defendant to show the contrary.

For the purposes of this case, then, we will consider it as if the loss of the mare was occasioned by the negligence of the defendant; and we find that this Court in the case of *Maslin* v. *Railroad Co.*, 14 W. Va. 180 (second point of syllabus) has held that "a common carrier for hire by special contract based on a valuable consideration may

exempt itself from loss or damage resulting from inevitable accident, though such accident was not the result of the act of God or of the public enemy, provided the common carrier or its servants in no manner contributed to such accident; but it can not exempt itself from loss or damage which has in any degree been caused by the negligence or misfeasance of itself or its servants."

That case was one in which a lot of cattle were shipped over the Baltimore & Ohio Railroad under a special contract, in which it was provided, that in consideration of a reduced rate of charges the plaintiff assumed certain specified risks; that is, all and every risk of injuries which the animals or any of them might receive, in consequence of any of them being wild, vicious, unruly, weak, escaping, maiming, or killing themselves or each other, or from delays, or in consequence of heat, suffocation or the ill effects of being crowded on the cars, or on account of being injured by burning of hay or straw or other material used by the owner for feeding them or otherwise, and for any damage occasioned thereby, and also all risk of any loss sustained by reason of any delay, or for other causes or things in or incident to or from or in loading or unloading the cattle. And by said special agreement the plaintiff agreed to load and unload the cattle at his own risk, the defendant to furnish the necessary power to move the cars under the plaintiff's direction, who was to examine for himself, and see that they were of sufficient strength, of the right kind, and in good repair. And it was further agreed that under no circumstances should the defendant be responsible for injury to or loss of any single animal beyond two hundred dollars, though its value might be more. And the plaintiff or his agent was to have a free passage on the cars, to take care and charge of the cattle, but at his own risk of personal injury from any cause. And the plaintiff released the defendant from all responsibility for losses before referred to, or from any other that might happen from mistakes or unavoidable accident in the transportation of the cattle. The weather was very warm, the cattle were placed in two cars and accompanied by plaintiff's agent; the cars were delayed, and two cattle

died on the way from heat, and others were seriously injured.

The facts in the case under consideration are quite different. In this case the plaintiff, for the purpose of getting the benefit of reduced rates of carriage, fixed the value of his mare at one hundred dollars, and paid in consequence three dollars and twenty five cents freight, whereas, if he had placed her at one hundred and seventy five dollars, he would have been required to pay seven dollars; and he agreed that in case of loss or damage on the defendant's line, for which said company might be responsible under said contract, it should be limited to one hundred dollars.

Now under this contract, if the plaintiff was honest in fixing the value of the mare at one hundred dollars, and agreeing to receive that amount in the case of a loss for which the defendant was legally liable, what unfairness or unreasonableness could there be in the contract. If the mare was lost, he would get the value fixed on her by himself; but if he fixed that value below the real value of the mare, for the purpose of enjoying the benefit of the reduced rates, would it be reasonable and right to allow him, when the loss occurs, to put a higher value on her, which he could have done at the time of shipment, and would no doubt have done, if he had not wished to avoid the additional freight charge?

As I understand this contract, it does not exempt the defendant railroad from liability, and such was not the intention of the parties thereto. It merely fixes the amount of liability which will be incurred in the event of loss, by placing a valuation on the property to be handled by the road. In the case of *Maslin* v. *Railroad Co.*, *supra*, it will be noticed that the court held that the company could not exempt itself from loss or damage by special contract. It does not, however, hold that the shipper, by special contract with the railroad, can not ascertain and fix the prospective liability of the road in case of loss by fixing a fair and honest valuation on the property.

In the case of *Hart* v. *Railroad Co.*, reported in 112 U. S. 331 (5 Sup. Ct. Rep. 151) will be found a case which bears

a great similarity to the one at bar. In that case a party shipped five horses and other property by a railroad in one car, and under a bill of lading signed by him, which stated that the horses were to be transported upon the following terms and conditions, which are admitted and accepted by him as just and reasonable : First, to pay freight thereon at a rate specified, "on the condition that the carrier assumes a liability on the stock to the extent of the following agreed valuation : If horses or mules, not exceeding two hundred dollars each ; if a chartered car, on the stock and contents in same one thousand and two hundred dollars for the car load. But no carrier shall be liable for the acts of the animals themselves, nor for loss or damage arising from the condition of the animals themselves, which risk, being beyond the control of the company, are hereby assumed by the owner, and the carrier released therefrom."

By the negligence of the railroad company or its servants, one of the horses was killed and the others were injured, and the other property was lost. In a suit to recover the damages, it appeared that the horses were race horses, and the plaintiff offered to show damages, based on their value, amounting to over twenty five thousand dollars. The testimony was excluded, and he had a verdict for one thousand two hundred dollars. On a writ of error brought by him it was held (1) the evidence was not admissible, and the valuation and limitation of liability in the bill of lading were just and reasonable, and binding on the plaintiff; (2) the terms of the limitation covered a loss through negligence.

It was also held that "when a contract of carriage signed by the shipper is fairly made with a railroad company, agreeing on a valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier the contract will be upheld as a proper and lawful mode of securing due proportion between the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuations."

In the course of his opinion delivered in that case, BLATCHFORD, J., says: "This qualification of the liability of the carrier is reasonable, and is as important as the rule which it qualifies. There is no justice in allowing the shipper to be paid a large value for an article which he has induced the carrier to take at a low rate of freight on the assertion and agreement that its value is a less sum than that claimed after the loss. It is just to hold the shipper to his agreement, fairly made, as to value, even where the loss or injury has occurred through the negligence of the carrier. The effect of the agreement is to cheapen the freight and secure the carriage, if there is no loss ; and the effect of disregarding the agreement after a loss is to expose the carrier to a greater risk than the parties intended he should assume."

The agreement as to value in this case stands as if the carrier had asked the value of the horses, and had been told by the plaintiff the sum inserted in the contract. See, also, Greenh. Pub. Pol. p. 517, and the numerous authorities there cited in support of this doctrine.

Under the strict rules of the common-law the liability of the common carrier is concisely stated by Hutchinson, in his valuable and exhaustive work on Carriers, as follows : "He is an insurer of the goods against all losses except those caused by the act of God, the public enemy, the law, the owner, or the inherent nature of the goods." If we treat the carrier as an insurer, it would surely be unreasonable to allow the shipper, at the time he is insured by placing his horse on the cars, to place one estimate on its value and pay freight in accordance with that estimation, and when a loss occurs to come forward and claim his insurance in the shape of damages by placing another and higher valuation upon the property. If there is any species of property about which men are disposed to differ, and differ honestly, it is in regard to the valuation placed upon horses from causal observation, and the ordinary railroad agent is not presumed to be capable of placing a proper estimate on the value of property of this character, even if he has an opportunity of inspecting it. For this reason, unless some value is allowed to be fixed upon the property

offered for shipment, the carrier is liable to be subjected to a gross imposition by allowing the owner of a horse, the value of which can only be estimated by thousands of dollars, to avail himself of the advantage of low rates by placing a low estimate on said property, and in the event of a loss to claim and recover the true value.

The question of the liability of common carriers under similar circumstances was presented to the court of appeals of Virginia in the case of *Railroad Co.* v. *Payne*, 86 Va. 481 (10 S. E. Rep. 749). The rulings of the court in that case clearly draw the distinction between an agreement entered into between a common carrier and a shipper to exempt the carrier from liability for injury or loss occasioned by the neglect or misconduct of such carrier, and a special agreement, in consideration of reduced rate of transportation, to limit his liability to a certain amount less than the value of the property in case of loss or damage occurring through his negligence.

In that State there is a statue which provides that "no agreement made by a common carrier for exemption from liability for loss occasioned by his own neglect or misconduct shall be valid." But said court, in its opinion, after quoting said statute, says: "But that is not the question before us. The question here is whether, when the shipper signs a bill of lading not exempting the carrier from liability for the negligence of himself or his servants, but limiting the amount in which the carrier shall be liable in consideration of the goods being carried at reduced rates, such a contract, fairly entered into, is valid and binding; and we see no reason why, when its terms are just and reasonable, it should not be. The test to be applied in all such cases is, was the contract fairly entered into, and are its terms just and reasonable?

The contract between the carrier and shipper, in the case at bar, was that in consideration of the freight on said horse being fixed at three dollars and twenty five cents the responsibility of the carrier should be limited to one hundred dollars for the horse, and not that the carrier should be exempted from liability. Now it will be conceded that a common carrier, in receiving property for shipment, is

entitled to a fair representation from the shipper as to the value of the property to be shipped, so that, being acquainted with the value of the article intrusted to his care, he may use care and vigilance commensurate with the risk he incurs.

So, in the case of *Muser* v. *Express Co.*, 1 Fed. Rep. 383 (decided by the United States Circuit Court for the southern district of New York) WALLACE, J., delivering the opinion, says: "The right of a carrier to exact fair information as to the value of the property confided to his care has always been recognized. He has a right to insist that his compensation be measured by his risk, and obviously the degree of care which he will exercise will measurably depend upon the extent of the responsibility he may incur," *etc.* And in the syllabus the court held that a "stipulation in a receipt limiting the liability of the carrier to a stated sum is binding upon the shipper, in the absence of a disclosure as to the real value of the goods shipped."

It may be noticed here that nothing in the case at bar shows that the defendant had any intimation that the horse shipped by the plaintiff for any reason exceeded in value the sum of one hundred dollars.

The Supreme Court of Wisconsin in the case of *Black* v. *Transportation Co.* 55 Wis. 319 (13 N. W. Rep. 244) held that "it is well settled that the common carrier of persons or property can not by any agreement, however plain and explicit, wholly relieve itself from liability for injury resulting from its gross negligence or fraud," and that "it is also settled that in order to exempt the carrier from liability, or to limit the extent of its liability, for injury caused by its own negligence of any kind, the contract must expressly so provide," and that "a contract providing that in case of loss the carrier shall be liable to pay as damages a specified sum will not, without an express stipulation to that effect, relieve the carrier from liability to the full amount of the goods lost through its negligence.

It is true that the Supreme Court of New York, in the case of *Gould* v. *Hill*, 2 Hill, 623, in 1842, held that "common carriers can not limit their liability or evade the consequences of a breach of their legal duties, as such, by an

express agreement or special acceptance of the goods to be transported."

Hutchinson on Carriers discussing this point says: "A few years after this decision the very same question came before the Supreme Court of the United States in the case of *New Jersey Steam Nav. Co.* v. *Merchants' Bank,* 6 How. 344, and the ruling in *Gould* v. *Hill* was disapproved; the Court being unanimously of the opinion that a common carrier might, at least by special contract, restrict his liability. This decision was soon followed in the Courts of New York, in which the decision in *Gould* v. *Hill* was abandoned as untenable; and the right of the carrier thus to limit his responsibility has ever since remained unquestioned in that State, and may now be stated as the well-settled law of our states as well as of the Supreme Court of the United States. The validity of such special contracts has indeed been nowhere denied, and the case of *Gould* v. *Hill* stands as the only reported case in which the right of the carrier to limit his liability in this way is held to be unlawful. It may therefore be stated as the universal law of this country that, in the absence of a statute prohibiting it, all common carriers may by express or special contract with their employer be exonerated from that rigorous rule of the common law which, in the absence of contract, makes them insurers of the safety of the goods intrusted to them."

See, also, Ang. Carr. § 259, and also the case of *Railroad Co.* v. *Sherrod,* 84 Ala. 178 (4 So. Rep. 29) where it was held that "a common carrier may by special contract limit his liability for loss of goods to an amount agreed on as the value, in consideration of a reduced rate of freight, provided no extortion or coercion is practiced or threatened, and no undue advantage taken of the shipper; but such special contract does not protect the carrier against liability for fraud, nor for intentional, wanton, or reckless negligence."

So, also, in the case of *Hill* v. *Railroad Co.,* 144 Mass. 284 (10 N. E. Rep. 836) it appears that "cows belonging to A. were delivered to a common carrier by an agent of A., who was employed to attend to the care and transportation of

the cattle, and who signed an agreement for their transportation by railroad, in which the value of each cow was estimated at a certain sum, and which provided that the owner of the cows should assume all risk of loss or damage from any cause except from collision of trains, in which case the carrier should not be held liable for a greater sum than that specified in the agreement;-that the rates of transportation were based upon and intended only for cows of the value specified; and that an additional rate would be charged for cows of greater value. One of the cows was killed by the negligence of the carrier, and not by a collision of trains. Held, in an action by A. against the carrier, that he could recover only the value of the cow as expressed in the agreement, and that he was bound by the agreement made with his agent."

In *Graves* v. *Railroad Co.*, 137 Mass. 33, the facts are similar and the same principle is announced; and while there is considerable conflict in the decisions the result of our examination has been that the great weight of authority is in favor of the principles announced in the decisions and authorities above quoted.

As we understand the ruling of this Court in *Muslin* v. *Railroad Co.*, *supra*, it was held in that case that "a common carrier for hire may by special contract, based on valuable consideration, exempt itself from loss or damage resulting from inevitable accident, though such accident was not the result of the act of God or of the public enemy, provided the common carrier or its servants in no manner contributed to such accident; but it can not exempt itself from loss or damage which was in any degree caused by the negligence or misfeasance of itself or its servants."

Our ruling in the case at bar is distinguished from the ruling in that case in this, that we here hold that "where a contract of carriage, signed by the shipper, is fairly made with a railroad company as a common carrier, and the valuation of the property shipped is agreed upon, and in consideration of the valuation so fixed a rate of freight, is determined upon, on the condition that the carrier assumes liability to the extent of the agreed valuation, even in the case of loss by reason of *prima facie* negligence of the

carrier the contract will be upheld as fixing the liability of the carrier in proportion to the freight he receives, and protecting himself against extravagant valuation ; and such a contract will not be upheld as exempting the carrier from all liability, but as limiting the liability in case of loss to the amount fixed by agreement. Having reached this conclusion the judgment complained of is reversed, the finding of the Circuit Court is set aside, and a new trial is awarded, with costs to the plaintiff in error.

BRANNON, JUDGE, (*concurring*).

I concur in the decision in this case. To avoid misapprehension of my own views, I desire to say that the shipper may require the carrier to ship his property under the imperative requirement of the law of the land, and pay the rate of freight prescribed by that law, and he can not be compelled to sign any bill of lading or contract limiting the value of the property, or the amount of liability in case of loss. If, however, to obtain a lower rate, he choose to enter into a fair contract, limiting the liability, but not wholly exempting the carrier from liability for negligence, he is bound by his contract.

LUCAS, PRESIDENT, (*dissenting*).

In the leading case of *Railroad Co.*, v. *Lockwood*, 17 Wall. 357, Justice BRADLEY, in delivering the opinion of the court, said : "In regulating the public establishment of common carriers the great object of the law was to secure the utmost care and dilligence in the performance of their important duties—an object essential to the welfare of every civilized community. Hence the common-law rule which charged the common carrier as an insurer. Why charge him as such ? Plainly, for the purpose of raising the most stringent motive for the exercise of carefulness and fidelity in his trust. In regard to passengers the highest degree of diligence is expressly exacted. In the one case the securing of the most exact diligence and fidelity underlies the law, and is the reason for it ; in the other, it is directly and absolutely prescribed by the law. It is obvious, therefore, that if a carrier stipulate not to be bound to the exercise of

care and diligence, but to be at liberty to indulge in the contrary, he seeks to put off the essential duties of his employment; and to assert that he may do so seems almosts a contradiction in terms.

"Now to what avail does the law attach these essential duties to the employment of the common carrier, if they may be waived in respect to his agents and servants, especially where the carrier is an artificial being, incapable of acting except by agents and servants? It is carefulness and diligence in performing the service which the law demands, not an abstract carefulness and diligence in proprietors and stockholders who take no active part in the business. To admit such a distinction in the law of common carriers, as the business is now carried on, would be subversive to the very object of the law.

"It is a favorite argument in the cases which favor the extension of the carrier's right to contract for exemption from liability that men must be permitted to make their own agreements, and that it is no concern of the public on what terms an individual chooses to have his goods carried. Thus, in *Dorr* v. *Navigation Co.*, 4 Sandf. 136, the court sums up its judgment thus: 'To say the parties have not a right to make their own contract, and to limit the precise extent of their own respective risks and liabilities, in a matter no way affecting the public morals or conflicting with the public interests, would in my judgment be an unwarrantable restriction upon trade and commerce, and a most palpable invasion of personal right.'

"Is it true that the public interest is not affected by individual contracts of the kind referred to? Is not the whole business community affected by holding such contracts valid? If held valid the advantageous position of the companies exercising the business of common carriers is such that it places it in their power to change the law of common carriers, in effect, by introducing new rules of obligation. The carrier and his customer do not stand on a footing of equality. The latter is only one individual of a million. He can not afford to higgle or stand out and seek redress in the courts. His business will not admit such a course. He prefers rather to accept any bill of lading, or

sign any paper the carrier presents; often, indeed, without knowing what the one or the other contains. In most cases he has no alternative but to do this or abandon his business. * * * If the customer had any real freedom of choice, if he had a reasonable and practicable alternative, and if the employment of the carrier were not a public one, charging him with the duty of accommodating the public in the line of his employment, then, if the customer chose to assume the risk of negligence, it could with more reason be said to be his private affair, and no concern of the public.

"But the condition of things is entirely different, and especially so under the modified arrangements which the carrying trade has assumed. The business is mostly concentrated in a few powerful corporations, whose position in the body politic enables them to control it. They do, in fact, control it, and impose such conditions upon travel and transportation as they see fit, which the public are compelled to accept. These circumstances furnish an additional argument, if any were needed, to show that the conditions imposed by common carrier ought not to be adverse, to say the least, to the dictates of public policy and morality. The *status* and relative position of the parties render any such condition void.

"Contracts of common carriers, like those of persons occupying a fiduciary character, giving them a position in which they can take undue advantage of the persons with whom they contract, must rest upon their fairness and reasonableness. It was for the reason that the limitations of liability first introduced by common carriers into their notices and bills of lading were just and reasonable that the court sustained them. It was just and reasonable that they should not be responsible for losses happening by sheer accident or dangers of navigation that no human skill or vigilance could guard against. It was just and reasonable that they should not be chargeable for money or other valuable articles liable to be stolen or damaged unless apprised of their character or value. It was just and reasonable that they should not be responsible for articles liable to rapid decay, or for live animals liable to get unruly from fright, and to

injure themselves in that state, when such articles or live animals became injured without their fault or negligence.

"And when any of these just and reasonable excuses were incorporated into notices or special contracts assented to by their customers the law might well give effect to them, without the violation of any important principle, although modifying the strict rules of responsibility imposed by the common law. The improved state of society and the better administration of the laws had diminished the opportunities of collusion and bad faith on the part of the carrier, and rendered less imperative the application of the iron rule that he must be responsible at all events. Hence the exemptions referred to were deemed reasonable and proper to be allowed.

"But the proposition to allow a public carrier to abandon altogether his obligations to the public, and to stipulate for exemptions that are unreasonable and improper, amounting to an abdication of the essentail duties of his employment, would have never been entertained by the sages of the law. * * * Conceding, therefore, that special contracts made by common carriers with their customers, limiting their liability, are good and valid so far as they are just and reasonable (to the extent, for example, of excusing for all losses happening by accident without any negligence or fraud on their part) when they ask to go still further, and to be excused for negligence—an excuse so repugnant to the law of their foundation and to the public good—they have no longer any plea of justice or reason to support such a stipulation, but the contrary; and then the inequality of the parties, the compulsion under which the customer is placed, and the obligaiion of the carrier to the public, operate with full force to divest the transaction of validity."

In the syllabus of that case it is said : "A common carrier can not lawfully stipulate for exemption from responsibility when such exemption is not just and reasonable in the eye of the law. It is not just and reasonable, in the eye of the law, for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants." It is further held in the same case, *arguendo :* "That a common carrier does not drop his character as such

merely by entering into a contract for limiting his responsibility. That carefulness and fidelity are essential duties of his employment, which can not be abdicated. That these duties are as essential to the public security in his servants as in himself." In the same opinion, there is quoted with approval the following conclusion reached by Chief Justice Redfield in his American Railway Cases: "(1) That the exemption claimed by carriers must be reasonable and just; otherwise, it will be regarded as extorted from the owners of the goods by duress of circumstances, and therefore not binding. (2) That every attempt of carriers, by general notices or special contract, to excuse themselves from responsibility for losses or damages, resulting in any degree from their own want of care and faithfulness, is against that good faith which the law requires as the basis of all contracts or employments, and therefore based upon principles and a policy which the law will not uphold."

I have quoted at large from this opinion, because, up to a very recent period, it settled the law upon this subject in the Supreme Court of the United States, and was relied upon as a leading authority by many of the State courts, and particularly by this, the highest tribunal of our own State.

In the case of *Maslin* v. *Railroad Co.*, 14 W. Va., 180, a similar doctrine is laid down. In the second point of its syllabus, it is there said: "A common carrier for hire, by special contract, based on a valuable consideration, may exempt itself from loss or damage resulting from inevitable accident, though such accident was not the result of the act of God or of the public enemy, provided the common carrier or its servants in no manner contributed to such accident; but it can not exempt itself from loss or damage which has in any degree been caused by the negligence or misfeasance of itself or its servants." In that case the contract was almost identical with the one we are now considering, and was in like manner embraced in the printed bill of lading. The case of *Railroad Co.* v. *Lockwood* was cited approvingly and largely relied on by Judge GREEN in delivering the opinion.

In the case of *Brown* v. *Express Co.*, 15 W. Va. 812, the same principles were reaffirmed after an exhaustive examination of the various authorities by the same eminent jurist (Judge GREEN) who delivered the opinion.

Now these two cases, it was to be hoped, had definitely settled the law upon this subject in West Virginia. But unfortunately the supreme court of the United States has in a more recent case undertaken to vitalize these printed bills of lading into contracts between parties on an equal footing, and to draw a distinction between *limiting* the liability of the common carriers and *exempting* them from such liability.

In the case of *Hart* v. *Railroad Co.*, 112 U. S. 331 (5 Sup. Ct. Rep. 151) this distinction, entirely too refined for common sense to appreciate, was insisted upon. The facts and circumstances of that case are found in the opinion in the present case, concurred in by a majority of the Court. The least that can be said about it is that, while it disclaims to overrule the case of *Lockwood* v. *Railroad Co.*, yet it is, both in reasoning and principle, in direct conflict with the older decision. For example, by referring to the quotation which we have already made from the opinion of Justice BRADLEY, it will be seen that he expressly repudiates the idea that the parties are standing "upon a footing of equality," and that the contract can be construed as if made between private individuals. His language is (our italics):

"*If the customer had any real freedom of choice*, if he had a reasonable and practical alternative, and if the employment of the carrier were not a public one, charging him with the duty of accommodating the public in the line of his employment, then, if the customer chose to assume the risk of negligence, it could with more reason be said to be his private affair, and no concern of the public. But the condition of things is entirely different, and especially so under the modified arrangements which the carrying trade had assumed. The business is mostly concentrated in a few powerful corporations, whose position in the body politic enables them to control it. They do in fact control it, and impose such conditions upon travel and transportation as they see fit, *which the public are compelled to accept.*" Com-

pare this language with the following from Justice BLATCH-
FORD in *Hart* v. *Railroad Co., supra:* "The agreement as to
value in this case stands as if the carrier had asked the
value of the horses, and had been told by the plaintiff the
sum inserted in the contract. * * * The shipper is es-
topped from saying that the value is greater. The articles
had no greater value, for the purposes of the contract of
transportation between the parties to that contract. The
carrier must respond for negligence up to that value. It is
just and reasonable that such a contract, fairly entered
into, and where there is no deceit practiced on the shipper,
should be upheld. There is no violation of public policy."

Why this reasoning as to a compulsory contract con-
tained *in a printed bill of lading,* should be applicable to a
*limitation,* and not applicable to an *exemption,* from liabil-
ity, it would puzzle the most ingenious mind to conjecture.
If the carrier and the shipper stand upon equal terms, and
can make a contract to restrict the liability of the former to
the lowest limit of value, without any regard whatever to
actual valuation, why can not the same contracting parties
make a contract for absolute exemption? In point of fact,
to limit is to exempt *pro tanto.* When a printed valuation,
as in this case, is set upon all horses shipped, without any
regard for actual value, and the horse is killed by the neg-
ligence of the carrier, does not the carrier, by reason of
this so-called contract, exempt himself from liability so
far as the true value of the horse may prove to be above the
artificial printed valuation of the bill of lading, which is
fixed by the company, and to which the shipper must submit
or not ship at all?

But, so far as the law of this State is concerned, we are
not left to inference or conjecture as to what our conclusion
should be. In the case of *Brown* v. *Express Co., supra,* the
question was not one of exemption alone, but of limitation,
also; and this Court expressly held that the common carrier
could not by such a contract *limit* its liability, just as it had
previously held, in the case of *Maslin* v. *Railroad Co.,* that
it could not *exempt* itself.

The syllabus of the former case is as follows: "(2) A
common carrier does not, by limiting his common-law lia-

bilities by special contract, thereby become a private carrier; and if loss is sustained the burden of proof is on him to show, not only that such loss arose from a cause from which he was exempted from responsibility by the terms of his special contract, but also that it arose from no negligence ·or misfeasance of himself or his servants. "(3) A common carrier can not limit his common-law responsibilities by any general notice, though knowledge of such general notice be brought home to the consignor before or at the time he applied to have his goods transported."

In that case Judge GREEN especially repudiates much of the authority relied on to support the view of the supreme Court in *Hart* v. *Railroad Co.*, and disposes of the Pennsylvania cases relied upon by simply saying that they "are not good law." 15 W. Va. 817, 818.

In the present case, *Brown* v. *Express Co.*, is not even referred to in the opinion of the learned judge, concurred in by the majority, and must have been overlooked. Upon examining it, it will be found that it thoroughly disposes of the ingenious effort of the more modern jurists to distinguish between limitation of liability on the part of the common carrier and entire exemption.

Upon looking at the bill of lading in the case of *Hart* v. *Railroad Co.*, it will be found that it limits the value of horses to two hundred dollars, and the limitation of time within which suit shall be brought by the shipper to sixty days; and this contract was upheld by the Supreme Court because its terms were held to be "reasonable."

In the bill of lading before us the value of horses is fixed at half that amount, or one hundred dollars, and the shipper is limited in his right of action to ten days, or one sixth of the time specified in the former bill of lading. By the decision from which I dissent, we have expressed the opinion that a horse reasonably worth two hundred dollars, when offered at any point for transportation on the Pennsylvania Railroad, is reasonably worth only one hundred dollars if offered for transportation on the line of the Chesapeake & Ohio Railroad Co., and that sixty days being a reasonable limitation of time in the State of Massachusetts it logically follows that ten days is a reasonable limitation of the right of action in West Virginia.

Upon the whole, I think it preferable to adhere to our own landmarks as established by our predecessors, rather than to subvert them by following the decisions of other co-ordinate tribunals, however eminent or respectable. And, as for recent decisions quoted from the State of Virginia, I much prefer to follow the case of *Railroad Co.* v. *Sayers*, 26 Gratt. 328, which holds: "(2) But a railroad company can not by express contract, though upon the consideration of a reduced charge upon the freight, relieve itself from its liability, as carrier of the freight, for injury to or loss of the freight resulting in any degree from the want of care or faithfulness of themselves or their agents." In *Maslin* v. *Railroad Co.*, this Virginia case was cited and relied upon; and I prefer to adhere to it rather than to adopt the somewhat erratic course of decision upon these subjects which characterizes the Court of Appeals of Virginia as now constituted.

REVERSED. REMANDED.