STATE *v.* GARLAND.

STATE v. GARLAND.

(Filed May 16, 1905.)

*Homicide—Manslaughter—Self-Defense—Provoking Fight.*

1.  Where a man provokes a fight by unlawfully assaulting another, and in the progress of the fight kills his adversary, he will be guilty of manslaughter at least, though at the precise time of the homicide it was necessary for the original assailant to kill in order to save his own life.

2.  In case of a mutual combat, in order to excuse the killing on the plea of self-defense, it is necessary for the accused to show that he quitted the combat before the mortal wound was given and retreated as far as he could with safety, and then, urged by mere necessity, killed his adversary to save his own life.

CONNOR and WALKER, JJ., dissent.

INDICTMENT against Elisha Garland for murder, heard by *Judge W. H. Neal* and a jury, at the August Term, 1904, of the Superior Court of McDOWELL County. The evidence considered necessary to a proper understanding of the decision is as follows:

Alfred Williams, for the State, testified that "Just before deceased came in prisoner was drinking, cursing and talking. I was in there when deceased came in. When he came in he walked up to the stove and turned his back to it. Prisoner told Calicutt, the deceased, to put some coal in the stove. Deceased said, 'I am not working here.' Prisoner told him again about the stove and fire. Deceased said he had no authority there. Prisoner said, 'Damn you, you will do it, too.' Calicutt turned around. Prisoner caught him in the collar, shoved him back and shot him between the eyes. When prisoner had deceased by the collar one of the men said, 'Don't do that, Leish; quit.' Calicutt never said anything but what I have told. When the shot was fired deceased fell. Prisoner dropped his pistol, picked it up, opened the

door with both hands and went out. Calicutt went out on the platform. Nothing was said except what I have told."

As to dying declarations of deceased, James Calicutt testified: "Deceased was my son. He lived eight days after he was shot between the eyes. He was conscious all the time. He told me when he came home that he was shot. He said every day he was going to die; asked me and his mother to pray for him. He said he had been to the festival; started home; went down to the railroad bridge with some others who were going to a wake at Morehead City (in this county). He got to the bridge and said he would not go further; went into the depot to see what time it was, and some one, he did not know who, asked him to make a fire in the stove. He told the man, 'I don't work here.' The man said, 'You've got to make it, for I am cold.' This fellow said, 'Maybe you are not going to do it.' Deceased said, 'No, for I don't work here.' The man said, 'God damn you, I'll see if I can make you do it,' grabbed me (deceased) in the collar and shot me.' Deceased said he fell behind the door."

The prisoner, Elisha Garland, testified in his own behalf: "I laid down and dozed off to sleep. When deceased came in the door slammed and woke me. That was the time Ive Calicutt, deceased, came in. I had not seen him before. Did not know him. I was lying where the partition between the seats was torn out, on my left side, asleep. Door slammed and I woke. I raised my head and laid down again. Cold chill ran over me. I looked and saw the darkey standing up near the stove with his back to it. I said, 'Partner, wake that man and tell him to put some coal in the stove.' He said, 'I have nothing to do with waking him.' I said, 'Can't you wake him and tell him to make a fire in the stove?' He turned his head to the left and said, 'Who are you; a Mitchell County son of a bitch?' I said, 'Don't you say that any more.' I jumped up and said, 'You have got that to take back.' He said, 'I don't say a damn thing to take back.' I

said, 'There have been men who said things and took back.'
He said, 'you damn liar, you son of a bitch, I will shoot your
head off.' Threw his right hand to his right hip, threw him-
self to the right and turned on his heel. I drew a revolver
and fired. I fired when he threw himself around. His face
was straight towards me. I dropped my pistol when I went
to open the door, picked it up and went out the door and
left. He was standing up on the south side and I walked up to
him on the north side. I walked up from where I was lying
at the stove, ten or twelve feet to where he was, and the
shot was fired in two minutes."

On cross-examination prisoner testified: "I saw no fire-
arms on the deceased. No gun or knife, no rock or stick.
He never moved one step towards me. Saw no stick. Made
no attempt to strike me. The Governor offered a reward
for me. I was found in Mitchell County. I never heard
Hollifield say, 'Stop, Leish; don't do that.' I came over here
to work. Did not bring my trunk or any clothes except what
I wore. When I told him he had to take that back, then it was
I walked up to where he was, at the side of the stove. I was
indicted for marrying a woman through a joke. I have been
in the U. S. Army; joined in 1902. I gave in my age as 18.
I was not sworn as to my age. I was in the army fourteen
months. The mock marriage took place in the woods. I was
drunk once six or eight years ago."

The court among other things instructed the jury, after
reciting all the evidence, that if they believed the prisoner's
evidence and that of his witnesses to be true, he would at
least be guilty of manslaughter. To the foregoing charge
the prisoner in apt time excepted and assigned the same as
error. This was the only exception as to the charge given.

The jury rendered a verdict of guilty of manslaughter,
and from the judgment thereon the prisoner appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
*A. C. Avery* and *P. J. Sinclair* for the prisoner.

---

---

HOKE, J., after stating the case: It is the law of this State that where a man provokes a fight by unlawfully assaulting another and in the progress of the fight kills his adversary, he will be guilty of manslaughter at least, though at the precise time of the homicide it was necessary for the original assailant to kill in order to save his own life. This is ordinarily true where a man unlawfully and willingly enters into a mutual combat with another and kills his adversary. In either case, in order to excuse the killing on the plea of self-defense, it is necessary for the accused to show that he "quitted the combat before the mortal wound was given, and retreated or fled as far as he could with safety, and then, urged by mere necessity, killed his adversary for the preservation of his own life." Foster's Crown Law, p. 276.

The same author says on page 277: "He therefore who, in case of a mutual conflict, would excuse himself on the foot of self-defense, must show that before the mortal stroke was given he had declined any further combat and retreated as far as he could with safety, and also that he killed his adversary through mere necessity and to avoid immediate death. If he faileth in either of these circumstances he will incur the penalty of manslaughter." To the same effect is Lord Hale, who lays it down, "That if A assaults B first, and upon that assault B re-assaults A and that so fiercely that A cannot retreat to the wall or other *non ultra* without danger of his life, and then kills B, this shall not be interpreted to be *se defendendo*, but to be murder or simple homicide (manslaughter), according to the circumstances of the case; for otherwise, we should have all the cases of murder or manslaughter by way of interpretation, turned into *se defendendo*."

This principle was approved and applied in this State in *Brittain's case*, 89 N. C., 481. There, it was held that when a prisoner makes an assault upon A and is re-assaulted so fiercely that he cannot retreat without danger of his life, and

the prisoner kills A, the killing cannot be justified on the ground of self-defense. The first assailant does the first wrong and brings upon himself the necessity of slaying, and is therefore not entitled to the favorable interposition of the law. Applying this doctrine to the facts of this case, the court is of opinion that no error has been committed.

According to the prisoner's own version of the occurrence, he was asleep in the waiting room of the station and was waked up by the slamming of a door; feeling chilled, he said to the deceased: "Partner, wake that man up and tell him to put some coal in the stove," and the deceased replied: "I have nothing to do with waking him up;" the prisoner replied, "Can't you wake him up and tell him to put some fire in the stove?" The deceased then used most insulting language towards the prisoner, and the prisoner jumped up and said, "You have got to take that back," and advanced towards the deceased ten or twelve feet, when the deceased made a motion as if to draw a pistol, and the prisoner fired and killed him. On cross-examination the prisoner said, "I saw no fire arms on the deceased, no gun, no knife, no rock or stick. He never moved one step towards me, and made no attempt to strike me   *   *   *."

A fair and correct interpretation of this testimony puts the prisoner in the wrong at the commencement of the difficulty. Although he may have been grievously insulted, yet, in going up to the deceased, having advanced ten or twelve steps and saying, "You've got to take that back," the prisoner unlawfully brought on the affray, and under the authorities cited the position of self-defense is not open to him, unless he can show that he quitted the combat before the mortal blow was given. In telling the jury that on the prisoner's own statement, if believed, he was guilty of manslaughter, there was no error, and it is so adjudged.

No Error.

CONNOR, J., dissenting: The rule of law is daily announced and enforced by this court that when the defendant demurs to plaintiff's evidence and demands judgment, he thereby admits the truth of the evidence and every reasonable inference to be drawn therefrom most favorable to the plaintiff. "In passing on and deciding the question presented by the demurrer, the court must consider not only all the facts which the evidence tends to establish, but also such fair and reasonable inferences of fact as the jury, if trying the cause, might have lawfully drawn from such evidence." 6 Enc. Pl. & Pr., 442. The State having shown the killing with a deadly weapon and there being nothing in the evidence tending to show self-defense, the defendant assumed the position of actor. He took upon himself the burden of showing that he acted in defense of his own person. His Honor's instruction to the jury in respect to the legal effect of defendant's testimony, places the solicitor in the attitude of · demurring. Considered from this point of view and for the purpose of disposing of the exception, the principle invoked and applied in both civil and criminal cases applies. The general principle in regard to the law announced by the court, with some limitations not necessary to be noted for the purpose of this opinion, is conceded. This concession presents the question whether the facts testified to by the prisoner establish, as a matter of law, an assault by him. The latest definition of an assault, made by this court, is to be found in a well considered opinion in *State v. Daniel,* 136 N. C., 571, wherein it is said: "An assault is an intentional offer or attempt by violence to do an injury to the person of another. There must be an offer or attempt. Mere words, however insulting or abusive, will not constitute an assault. Nor will a mere threat or violence menaced, as distinguished from violence begun to be executed * * *. If, therefore, the defendant had threatened the prosecutor with violence, and the threat had been accompanied by any show

of force, such as drawing a sword or knife, or if he had advanced towards the prosecutor in a menacing attitude, even without any weapon and had been stopped before he delivered a blow, and the prosecutor had been put in fear and compelled to leave the place where he had the lawful right to be, the assault would have been complete, although he was not at that time in striking distance."

In *State v. Crow*, 23 N. C., 375, the court charged the jury, "That if the conduct of the defendant was such as would induce a man of ordinary firmness to suppose that he was about to be stricken, and to strike in self-defense, the defendant would by such conduct be guilty of an assault." *Daniel, J.*, said: "We admit such conduct would be strong evidence tending to prove * * * that his adversary *first* attempted or offered to strike him; but it is not conclusive evidence of the fact; for if it can be collected, notwithstanding appearances to the contrary, that there was not a purpose to do an injury, there is no assault. The law makes allowance to some extent for the angry passions and infirmities of men." The jury must judge of the circumstances. As was said by *Judge Gaston* in *Davis' case, Ibid.*, 127, "It is difficult in practice to draw the precise line which separates violence menaced from violence begun to be executed." It is for this reason that when there is a reasonable doubt as to the purpose of the defendant, his conduct being open to explanation, the question should be submitted to the jury. In *State v. Mooney*, 61 N. C., 434, a new trial was ordered because the judge told the jury "that in any view of the case the defendant was guilty." The testimony tending to show an assault was very much stronger than here. The court said: "After a careful consideration of the testimony we are obliged to say that in no view of the case is the defendant guilty." This is a striking illustration of the wisdom of the law, which submits to the jury not only the decision of the facts but the inferences to be drawn therefrom.

STATE *v.* GARLAND.

*State v. Milsaps,* 82 N. C., 549. The defendant was asleep in the public depot at night on February 4. He was awakened by deceased coming in; he felt cold and asked deceased to wake up the man in charge of the depot and tell him to put some coal in stove. Deceased refused, saying that he had nothing to do with the man. Defendant said: "Can't you wake him up and tell him to make a fire in the stove?" There was certainly nothing offensive in this language. Deceased retorted, applying to defendant most insulting and opprobrious language. Defendant "jumped up" and said: "You have got that to take back." Deceased said: "I don't say a damn thing to take back"—to which defendant said: "There has been men who said things and took back." It is not clear whether at this time defendant had walked towards deceased. As he narrates the occurrence, he says: "He said: 'You are a damn liar, etc. I will shoot your head off.' Threw his right hand to his hip and threw himself to the right and turned on his heel. I drew a revolver and fired. I fired when he threw himself around. He was standing on south side of stove, and I walked up to him on north side." There is not in the defendant's testimony any suggestion that he had made any threat or that as he walked towards deceased his attitude or manner was menacing—that his hand was raised or that his pistol was drawn. The inference is that it was not. He says: "I drew revolver and fired." I do not say that there was no evidence of an assault—I simply insist that the evidence should have been submitted to the jury under proper instructions as to what constituted an assault. In the trial of cases involving allegations of negligence, it is only when the facts are admitted and but one inference can be drawn from them, that the court may say, as a matter of law, that the allegation is or is not established; if from the admitted facts two minds may reasonably differ, as to the inferences to be drawn, the question must be submitted to the jury, certainly when the citizen is charged with

crime and his conduct is capable of more than one construction. "It is neither charity nor common sense nor law to infer the worst intent which the facts will admit of * * *. The guilt of a person is not to be inferred because the facts are consistent with his guilt, but they must be inconsistent with his innocence." *Ashe, J.,* in *State v. Massey,* 86 N. C., 661.

Therefore, unless it can be said, as a matter of law, that the conduct of defendant constituted an assault, the question should have been submitted to the jury—because, as was wisely said by *Henderson, J.,* in *Bank v. Pugh,* 8 N. C., 198, "The jury are the constitutional judges, not only of the truth of testimony, but of the conclusions of fact resulting therefrom." It is for the same reason that this court has repeatedly held that it is error to charge the jury that if they believe the evidence they should convict the defendant. *State v. Barrett,* 123 N. C., 753; *Sossamon v. Cruse,* 133 N. C., 470; *State v. Green,* 134 N. C., 658. A man is grossly insulted—he demands a retraction—this he has a right to do; a duty to himself to do. He walks toward the person using the language—making no threat—using no violence—no demonstration of force—is it possible that thereby he becomes, as a matter of law to be declared by the court, an outlaw—that his God-given right of self-defense is thereby forfeited? If this be the law and the deceased had drawn and presented his pistol after his threat to kill the defendant, but one of three courses was left him—to be shot in his track, turn his back and flee, thereby increasing his danger, or defend himself by taking the life of his assailant and submitting to a judgment branding him as a felon—and subjecting him to an infamous punishment. I cannot think this is the law. I have not so learned it from the Elders. It may be said the case put is extreme. Without conceding it to be so, I think it fairly illustrates the principle laid down by the court. If His Honor was in error in saying that upon his

own testimony the defendant was guilty of an assault and was thereby deprived of the right to defend himself, there should be a new trial because the jury were not permitted to enquire whether at the time he shot the deceased, the prisoner had reasonable ground to apprehend and did apprehend that he was in danger of death or great bodily harm. The defendant requested His Honor to instruct the jury: "If the defendant has satisfied you from the evidence that when he arose from his seat and approached toward deceased, saying, 'Don't say that again;' 'you have got to take that back,' only meant to remonstrate with him and not to fight or injure him, and that he did not offer to strike deceased, nor make any further demonstration of force, and that thereupon deceased, suddenly turning half round, threw his right hand on his right hip pocket as if to draw a pistol, cursing defendant and threatening to shoot him, caused the defendant to believe, and was sufficient to cause him to reasonably apprehend that he was about to lose his life or suffer great bodily harm, and thereupon he suddenly fired the fatal shot, then it would be excusable homicide, and you would answer the issue in favor of the defendant."

This was refused. I think the instruction should have been given. It involved the inquiry whether the defendant had made an assault upon the deceased. If they had found the hypothesis involved in the instruction in that respect to be true, there can be no doubt of the correctness of the concluding portion of the instruction. Other instructions varying the form but presenting the same question to the jury were asked and refused.

The opinion concludes with the statement, "A fair and correct interpretation of this testimony puts the prisoner in the wrong at the commencement of the difficulty. Although he may have been grievously insulted, yet, in going up to the deceased, having advanced ten or twelve steps, and saying: 'You've got that to take back,' the prisoner unlawfully

brought on the affray and, under the authorities cited, the position of self-defense is not open to him unless he can show that he quitted the combat before the mortal blow was given." I respectfully but strongly dissent from so much of this proposition as assumes that the testimony puts the prisoner in the wrong at the commencement of the difficulty. I assume that it is meant that he committed an act which was illegal—that is, that he made an assault upon deceased. If the prisoner had stopped at the stove and the matter had ended as he reached that point, could it be said that, as a matter of law, an assault had been committed. It is not clear that the court should not, in that event, have held that as a matter of law no assault was committed. However that may be, I entertain no doubt that the defendant would have been entitled to a trial by jury. By the ruling of the judge the defendant was not permitted to have his plea of self-defense considered by the jury. It may be said that ample evidence was introduced by the State to establish the defendant's guilt. That may be true. The defendant may be guilty; if so it was the province of the jury and not the court to find the fact. No matter how guilty he may be, he is none the less entitled to a trial according to the law of the land—if he has been adjudged guilty otherwise, not only is a wrong done him, but a precedent is set which may be used to adjudge other men—innocent men—guilty. Crime must be punished, but the safeguards which the wisdom of the ages has established must not be removed or weakened. I find in the language of *Mr. Justice Rodman* in *State v. Matthews,* 78 N. C., 537, the rule which should govern judges in the trial of criminal cases. He says: "We think he is required in the interest of human life and liberty, to state clearly and distinctly the particular issues arising on the evidence, and on which the jury are to pass, and to instruct them as to the law applicable to every state of the facts which upon the evidence they may reasonably find to be the true one. To do otherwise is to fail to

"declare and explain *the law arising on the evidence,* as by-the Act of Assembly he is required to do." I think the defendant is entitled to a new trial.

*Walker, J.,* concurs in the dissenting opinion.