THOMAS STRINGFIELD v. SOUTHERN RAILWAY COMPANY.

(Filed 9 March, 1910.)

1. Carriers of Freight—Negligence—Contracts—Restricting Liability.

　　A common carrier cannot, in its contract of shipment, stipulate against recovery for a loss or damage occasioned by its own negligence, whether such loss or damage is a total or partial one.

2. Same—Live Stock—Agreed Valuation—Negligence—Restricting Liability.

　　By a stipulation in an ordinary live-stock contract of shipment a common carrier cannot restrict the amount of recovery

brought about by its own negligence, it appearing that the con-
tract was for the shipment of a valuable horse, that there was
no effort of the parties to fix upon or approximate its correct
value, but the restriction was inserted according to an arbitrary
and inadequate valuation clause in a printed formula, predeter-
mined and without reference to the real value of the animal, and
without effort to ascertain such value. (*Jones v. R. R.*, 128
N. C., 449, cited and distinguished.)

3. Same—Fraud—Pleadings—Evidence.

The doctrine that a shipper may not recover the actual value of
his loss or damage caused by the negligence of the carrier, when
he is guilty of positive fraud in representing the character and
value of the goods shipped, reasonably relied on by the carrier,
does not apply when there is no allegation or suggestion of such
fraud; and the mere fact that it received for shipment a valua-
ble horse under its ordinary live-stock contract, restricting a
recovery in case of damage, through its negligence, to an arbi-
trary and predetermined value of such animals, is not evidence
thereof.

4. Carriers of Freight—Negligence—Restricting Liability—Public .
Policy—Estoppel.

A shipper is not estopped to recover on the basis of the actual
value of a horse injured by the carrier's negligence, and shipped
under a carrier's general live-stock contract containing an arbi-
trary and predetermined restriction on the value, as such re-
striction, so far as it affects injuries arising from the carrier's
negligence, is against public policy and void.

5. Carriers of Goods—Verdict—Value at Destination—Freight.

It appearing that, under the instructions of the court, the jury
awarded the amount of freight charges in a certain ascertained
sum in addition to the valuation of the horse at its destination of
shipment, the verdict is modified by deducting the amount of
freight charges, as the valuation there necessarily included them.

CLARK, C. J., concurring; BROWN and WALKER, JJ., dissenting.

APPEAL from *Ferguson, J.*, at July Term, 1909, of HAYWOOD.

Civil action to recover damages for injuries done to a mare,
shipped over the lines of defendant company, and attributed to
negligence on part of defendant and its employees.

There was evidence to the effect that the mare in question
was a valuable animal, standard-bred, about six years of age,
with fine qualities and great speed, and was bought by plaintiff
from W. A. Davis, Esq., at Lettsworth, La., in September, 1906,
for $450; that she was shipped from Lettsworth to New Orleans,
and there reshipped to plaintiff at address, Waynesville, N. C.,
on 25 September, 1906; that the ordinary time between the
points was something like four days, but the mare did not
arrive at Waynesville until 9 October, having been sent to a
wrong place and by improper routes, and by reason of this
delay and lack of proper care and attention, she arrived finally

at Waynesville in a very bad plight and condition, and was thereby seriously and permanently injured; that the charge for freight and feed paid by plaintiff amounted to $56.50; and plaintiff testified that the mare at Waynesville, in good condition, would have been worth from $1,000 to $1,500, and in her actual condition and owing to damage done in shipment, she was not worth more than $125 or $150. There was other testimony as to the high value of the mare, her excellent condition when received for shipment, and the great damage done by lack of proper care and attention on the route.

The mare was shipped in a single car, under an ordinary live-stock contract, in which it was stipulated: "That should there be damage for which said carrier may be liable, the value at the date and place of shipment shall govern the settlement; and in which the amount claimed shall not exceed, for stallion or jack, $150, for horse or mule $75, for mare and colt together $100, and which amount it is agreed are as much as such animals as are herein agreed to be transported are reasonably worth," etc.

Defendant offered no evidence, and there was no testimony of any representations made as to the value of the mare, nor any inquiry made by defendant's agents as to such value, or any agreement or bargaining together on such value, except as contained in the printed ordinary live-stock contract, signed by the shipper at the time the mare was received.

On the argument the plaintiff did not insist as a basis of adjustment on the value except at the place of shipment, and in the charge, on the question of damages, the court instructed the jury that this position having been taken by plaintiff, the jury could not in any event act upon a greater valuation; and they were further instructed that, if damages were allowed, they could add to the amount of the injury done the $56.50 costs for feed and transportation between the shipper and receiving party.

In apt time, and with other requests, the court was asked by defendant to charge the jury specially:

"4. That if the shipper declared the value of the mare, and the carrier accepted the same in good faith as the real value, and the freight rate was based thereon, then the stipulation is valid and binding upon the plaintiff, and the plaintiff is now estopped to claim a greater amount than the agreed valuation in the contract.

"5. That in no view of the case is the defendant entitled to recover more than $75."

Which requests were refused, and the defendant excepted.

The jury rendered the following verdict:

"1. Was the plaintiff's mare injured by negligence of defendant, as alleged in complaint? Answer: Yes. ·

"2. If so, what damages is plaintiff entitled to recover? Answer: $356.50."

Judgment on the verdict, and defendant excepted and appealed.

*W. T. Crawford* for plaintiff.
*W. B. Rodman* and *Moore & Rollins* for defendant.

HOKE, J., after stating the case: It is a principle well established in this State, that a common carrier, in its contract of shipment, cannot stipulate against recovery for a loss or damage occasioned by its own negligence, and it can make no such stipulation as to either total or partial loss.

Speaking to this question, in *Everett v. R. R.,* 138 N. C., 71, the Court said: "It is the law of this State, declared by repeated decisions, that common carriers are not permitted to contract against loss occasioned by their own negligence. They can contract neither for total nor for partial exemption from loss so occasioned. *Capehart v. R. R.,* 81 N. C., 438; *Gardner v. R. R.,* 127 N. C., 293. The same doctrine is very generally accepted in other jurisdictions. It would be an idle thing for the courts to declare the principle that contracts for total exemption from such loss are subversive of public policy and void, and, at the same time, permit and uphold a partial limitation which could avail to prevent anything like adequate and substantial recovery by the shipper. Therefore it is held that any limitation of liability by contract designed for the purpose is forbidden."

And the doctrine so stated is declared and sustained in numerous cases here and in other courts of recognized authority. *McConnell v. R. R.,* 144 N. C., 90; *Parker v. R. R.,* 133 N. C., 335; *Mitchell v. R. R.,* 124 N. C., 238; *Capehart v. R. R.,* 81 N. C., 438; *Calderon v. Steamship Co.,* 170 U. S., 272; *Railway v. Solan,* 169 U. S., 135; *Railway v. Lockwood,* 84 U. S., 357; *Moulton v. Railway,* 31 Minn., 85; *Railway v. Wynne,* 88 Tenn., 320; *Hudson v. R. R.,* 92 Iowa, 231; *Railway v. Hall,* 124 Ga., 322; *Railway v. Keener,* 93 Ga., 108; *Express Co. v. Blackman,* 28 Ohio St., 156.

In those States, however, where the principle indicated more fully obtains, it has been held that when properly understood and applied it does not prevent parties from agreeing upon the valuation of a given shipment which shall form the basis of adjustment in case of loss or damage; and where this is done in

the *bona fide* effort to fix upon the true value, and is made the basis of a fair and reasonable shipping rate, the parties will be held to the agreed valuation, though the loss shall occur by reason of the carrier's negligence. Conditions under which this apparent limitation upon the more general principle is at times permissible are suggested in *Everett's case, supra,* as follows: "Such agreements are upheld when the carrier, 'being without knowledge or notice of the true value,' and, it might be properly added, 'without fair and reasonable opportunity for obtaining the same,' the parties agree upon a valuation of the particular goods shipped, approximating the average value of ordinary goods of like kind, and make such valuation the basis of a just and reasonable shipping rate."

And in *Moulton's case, supra,* the same limitation (more broadly stated) and the reason for it are given as follows (page 89): "Yet there is no reason why the contracting parties may not in good faith agree upon the value of the property presented for transportation or fairly liquidate the damages recoverable, in accordance with the supposed value. Such an agreement would not be an abrogation of the requirements of the law, but only an application of the law as it is by the parties themselves to the circumstances of the particular case."

And in accord with this suggestion, in Hutchinson on Carriers, sec. 426, the author, after considering the various decisions on the subject, states the rule to be as follows: "For the purpose, therefore, of securing such information and of establishing a basis upon which to compute his charges, the carrier may, by a contract fairly and honestly entered into with the owner of the goods, stipulate either that the goods are of a certain value or that their value does not exceed a certain sum, and that, in the event of loss, his liability shall not exceed the sum at which the goods are valued; and when fairly entered into with a view to placing a *bona fide* value on the goods, the contract will be conclusive on the owner, and the carrier will not be liable for a greater sum than that at which the goods are valued, although his own misconduct has caused their loss." And in section 427: "And it may be stated as the better rule that, where the value agreed upon is so out of harmony with the ordinary values of similar kinds of goods as to indicate that the question of value did not in fact enter into the agreement, and the carrier, under the circumstances, must have known of the discrepancy, the agreement placing a value on the goods will be considered as a mere attempt by the carrier to secure a partial exemption from liability, and of no effect in relieving him from the obligation of responding for their real value where his misconduct has occasioned their loss. So, in the absence of fraud or conceal-

ment on the part of the owner of the goods whereby the carrier has been misled, the valuation agreed upon, it is said, must be reasonable, regard being had to the real value of the goods; and if such value be unreasonable, the owner will not be estopped from claiming damages on the basis of their real value."

The apparent limitation pointed out and stated in these citations was applied by this Court to a live-stock contract in *Jones v. R. R.*, 148 N. C., 480, where a quantity of stock was shipped in carload lots, and an average valuation placed on the shipment of $100 a head. While the average valuation fixed upon now for several years may have been too low, according to the price of stock which now prevails, and though the damage done to the particular horse and mule in that case was somewhat in excess of the average agreed upon, the Court was of opinion that the discrepancy or disposition was not so marked as to justify it in holding, as a matter of law, that the general average agreed upon in the contract was in violation of the public policy which forms the basis of the general rule. So the agreed valuation in that particular stipulation was upheld. And a like ruling was made at the present term, in *Winslow Brothers v. R. R.*

But, as pointed out in the concurring opinion in *Jones v. R. R., supra,* in order to extend the application of the doctrine suggested to a given shipment, all the conditions indicated must concur, and the ruling and the reason for it are, we think, correctly stated as follows:

"In the rare and exceptional cases when a carrier is allowed, on recovery had for breach of contract of carriage of certain classes of goods, to limit the amount of such recovery to a value fixed and predetermined by the contract of shipment, the rule is, I think, correctly stated in *Everett's case,* as follows: 'Such agreements are upheld where, the carrier being without knowledge or notice of the true value, the parties agree upon a valuation of the particular goods shipped, approximating the average value of ordinary goods of like kind, and make such valuation the basis of a just and reasonable shipping rate.' This rule is particularly applicable to shipments of stock in quantities, and eminently just to both parties to such contracts, affording to the shipper a fair and reasonable shipping rate and protecting the carrier from exorbitant and unconscionable recoveries by reason of excessive valuations which it had no opportunity to ascertain or to resist successfully, and for which it has received no adequate compensation. But to permit or uphold such a contract, when the loss arises from negligence, all the conditions suggested must exist. The carrier must be without knowledge or notice of the true value; the valuation must be

the fair average valuation of property of like kind, and it must have been made the basis of a fair and reasonable shipping rate."

Adding to the statement, as heretofore suggested, the carrier being without notice or knowledge of the true value or fair and reasonable opportunity for ascertaining the same.

We are not inadvertent to decisions in Massachusetts and in some other States to the effect that where a contract, fairly entered into between the carrier and the shipper, fixes the property at a stated value, and makes same the basis of the shipping rate and of adjustment in case of loss or damage, such valuation will be upheld, though the injury complained of arose from the carrier's negligence. *Wynne v. R. R.,* 98 Mass., 239; *Graves v. R. R.,* 137 Mass., 137. And we are aware that such a principle was expressly applied by the Supreme Court of the United States in the case of *Hart v. Railway,* 112 U. S., 331-343, and that this decision has since been followed by others of our State courts of high repute, as in *Railway v. Weakly,* 50 Ark., 397; *R. R. v. Sowell,* 90 Tenn., 17; *Johnston v. R. R.,* 39 S. C., 55; *Zouch v. R. R.,* 36 W. Va., 524.

In this last case, however, there was a strong dissenting opinion from *Lucas, President,* to which attention is especially called; and we submit that the general principle, as maintained in these decisions, if it can be upheld at all to the extent stated in the absence of actual fraud, is erroneously applied where, notably as in the *Hart case,* the disproportion between the actual and the stipulated value is so pronounced that it is plainly apparent that no effort was made to fix upon the true value of the property shipped, or even to approximate it. Such a ruling on the facts indicated is entirely inconsistent with the doctrine so often and clearly announced by our highest court, and which so generally obtains here and elsewhere: that while a common carrier may by a contract, reasonable in its terms and founded on a valuable consideration, relieve itself from liability as insurer, it cannot, in the absence of legislative sanction, limit its responsibility for loss or damage resulting from its negligence. *Lockwood's case, supra; Solan's case, supra.*

Applying, then, the doctrine as it prevails with us, we are of opinion that the restrictive provisions of this contract relied upon by defendant cannot avail for its protection; for, on the facts presented, it appears that the loss arose from defendant's negligence, and that there was no effort by the parties to fix upon a correct valuation of this mare, nor to approximate it; nor was there any place for determining the valuation by reference to the fair average valuation of a particular shipment, sometimes permissible, as in shipment of stock in quantities;

but the restriction was inserted according to a valuation in a printed formula, arbitrarily predetermined without reference to the real value of the animal, nor any effort to ascertain such value. And under numerous and well-considered decisions, here and elsewhere, a restrictive valuation so arrived at is invalid where the loss or damage arises from the carrier's negligence.

This was the only question presented in *Everett's case,* several times referred to. In that case, household goods were shipped at a reduced rate under a restrictive valuation of $5 per hundred pounds. The loss attributed to the carrier's negligence as, per contract rate amounted to $30, and in actual value it was $250; on verdict had, a recovery for the true value was sustained, notwithstanding the restrictive stipulation ·of the contract, and though it was entered into with the sanction and approval of the Corporation Commission. Speaking to the question in *Everett's case,* the Court said: "We are satisfied that in this instance both the commission and the railroads were prompted by a laudable motive to afford shippers of small means a lower freight rate. But we cannot allow such consideration in a particular case to change the rule of law that we here uphold. It is one in which the entire public is interested as well as the individual shipper, established and adhered to for grave and weighty reasons, and necessary for the protection of the great body of shippers. A principle so vital to the public interest should not be altered, or weakened, because,· in a given instance, the motive is good and the particular result desirable. If this valuation entered as an essential element into the rate here contended for, and the result would enable carriers to evade the law, the rate itself is invalid, and to that extent is not a binding regulation."

And after referring to various rulings of other courts, on such contracts, the opinion further says: "But in none of these is the valuation relied upon in this bill of lading sanctioned or justified to the extent here claimed for it. So far as we can discover, all of them condemn an effort to limit liability for negligence by a uniform predetermined valuation arbitrarily fixed and placed in a printed bill of lading without any reference to the actual value of the property, and without any estimate made or attempted to value the property of the particular shipment, more especially where the difference between the stipulated and actual value is so pronounced that the evident purpose and necessary effect are to practically deny recovery for negligence."

And in *Keener's case,* 93 Ga., 108, *Simmons, J.,* delivering the opinion, said: "Where a shipper enters into an express contract with a common carrier, by which he agrees in considera-

tion of a reduced rate of freight that the carrier shall not be liable for more than a stated sum in case the goods shipped are lost while in the carrier's possession, the contract will be upheld as to loss not involving negligence on the part of the carrier, but carriers cannot by any special contract exempt themselves from liability for loss occasioned by their negligence, and this is so as well where the contract provides for partial or limited exemption as where it contemplates total exemption from liability." After stating that under certain circumstances an agreed valuation will be upheld, *Judge Simmons* continues: "But the principle which relieves the carrier from liability for more than the agreed value does not apply where the real value is merely arbitrary and fixed without reference to the real value of the goods, and this is understood by the carrier as well as the shipper. In the present case there is no inquiry on the part of the carrier as to the value of the goods, and it is clear that a valuation of $5 per hundred pounds for wearing apparel and household goods indiscriminately could not have been understood to represent their actual value. The contract in question was simply an attempt to limit the liability of the carrier without regard to the actual value of the property, and it follows from what we have said that it was inoperative for that purpose, if the loss was occasioned by negligence on the part of the defendant. There being no explanation as to how the loss occurred, the presumption is that it resulted from the defendant's negligence."

And in *R. R. v. Hall, supra,* on a contract of this same kind, it was held: "4. A railway company, in its capacity as a common carrier, may, as a basis for fixing its charges and limiting the amount of its corresponding liability, lawfully make with a shipper a contract of affreightment, embracing an actual and *bona fide* agreement as to the value of the property to be transported; and in such case the latter, when loss, damage or destruction occurs, will be bound by the agreed valuation. But a mere general limitation as to the value, expressed in a bill of lading and amounting to no more than an arbitrary preadjustment of the measure of damages, will not, though the shipper assent in writing to the terms of the document, serve to exempt a negligent carrier from liability for the true value."

And these and other cases of like import are in accord with the doctrine approved and sustained by numerous and well-considered decisions of the Supreme Court of the United States, notably in the case of *Calderon v. Steamship Co.,* 170 U. S., 272. *Calderon's case* was an action involving a construction of what is known as the "Harter Act," a statute passed by Congress in February, 1893, chiefly for regulating the liability of carriers

of freight by water. Section 1 of the act, endeavoring to preserve the common-law liability of carriers, contained a provision prohibiting such carriers from making stipulations against liability for loss or damage arising from their negligence in certain features of their contract of shipment. In the contract in question there was a provision as follows: "It is also mutually agreed that the carrier shall not be liable for gold, etc., works of art, etc., or for goods of any description which are above the value of $100 per package, unless bills of lading are signed therefor with the value therein expressed and a special agreement is made." In action for loss attributable to the carrier's negligence, the restrictive stipulation of the contract was held void as against the provision of the act. Such provision, being expressive of the public policy, obtaining here, and *Associate Justice Brown,* in delivering the opinion, among other things, said:

"Under this interpretation there is a clear attempt on the part of the carrier to exonerate itself from all responsibility for goods exceeding the value of $100 per package. Such exemption is not only prohibited by the Harter Act, but is held to be invalid in a series of cases in this Court, culminating in *Chicago, Milwaukee, etc., Railway v. Solan,* 169 U. S., 133, 135, wherein it was said that 'any contract by which a common carrier of goods or passengers undertakes to exempt himself from all responsibility for loss or damage arising from the negligence of himself or servants, is void as against public policy, as attempting to put off the essential duties resting upon every public carrier by virtue of his employment, and as tending to defeat the fundamental principle upon which the law of common carriers was established.' The difficulty is not removed by the fact that the carrier may render itself liable for these goods, if 'bills of lading are signed therefor, with the value therein expressed and a special agreement is made.' This would enable the carrier to do, as was done in this case—give a bill of lading in which no value was expressed, under which it would not be liable at all for the safe transportation and proper delivery of the property. This would be in direct contravention of the Harter Act. Indeed, we understand it to be practically conceded that under the construction we have given to this clause of the contract the exemption would be unreasonable and invalid."

It is contended that to allow plaintiff to recover damages estimated on a valuation greater than that agreed upon, when such valuation was made the basis of a reduced shipping rate, would be to sanction and uphold a fraud; but we do not think that any such position is open to defendant in this case. There is doctrine well recognized that if a shipper is guilty of positive

fraud in representing the character and value of goods shipped, reasonably relied upon by the carrier, that recovery for the actual value will be denied; but no such principle is applicable here. The plaintiff, the shipper, bought the mare in Louisiana, and, so far as appears, was not present when the contract of shipment was entered into, and while he, no doubt, would be bound by the valid stipulations of his agent, there is no allegation or suggestion of positive fraud or misrepresentation on the part of either of them; no such issue was raised by the pleadings, and no such evidence offered; and counsel for defendant, on being questioned in this respect on the argument, frankly admitted that defendant had no such evidence at the trial, but stated that he had reason to believe that such evidence could be procured, and would be forthcoming if opportunity were given by another trial.

The fact that a single animal was shipped from New Orleans to Waynesville, at a cost of $56.50, might well be considered as affording fair notice that $75 was no correct valuation, and it is perfectly apparent, as heretofore stated, that the mare was shipped on an arbitrary valuation under a printed formula, and that no effort was made to fix upon a correct value, and no statement or inquiry was made by either side on the subject.

Speaking to a like position urged in *Everett's case,* so often quoted from, the Court said: "It is not claimed here that the carrier was misled or deceived in any way as to the kind or value of these goods. There is neither allegation nor issue addressed to any such question; and, as we understand it, the defendants did not intend or desire to raise it. Some of the goods lost were perhaps not correctly classified as household goods, but the amount properly described as household goods was more than sufficient to justify the verdict. As a matter of fact, no inquiry was made about the value of the goods and no statement made concerning them one way or the other. The agent just classified them at the established rate and uniform valuation provided for by the regulation and printed in the bill of lading, and no effort was made to estimate or put any value on the goods of this particular shipment."

Nor do we think that the doctrine of estoppel as applied in many of the cases relied upon by defendant should avail defendant here. Some of these decisions could be reconciled on the ground that if the disproportion between the actual and the stipulated values is so great as to give clear indication that there was no effort made to fix upon or approximate the true value, as in this case, it could be properly held that such a contract would be neither fair nor reasonable; but in many of them we think the doctrine of estoppel is too broadly stated.

For if a contract like that one we are considering is such as to deny substantial recovery for loss occasioned by the carrier's negligence, it is void as against public policy, and it is not permissible to uphold such an agreement on the principle of estoppel. Such a position carried to its logical conclusion would enable individuals as to their personal contracts and conduct towards each other to set at naught both the public statutes and police regulations of the State. Accordingly, we find that except in cases of positive fraud, which in whole or in part may operate to set aside the contract relation, the doctrine of estoppel as ordinarily applied is only available in aid or extension of valid contracts. Bigelow on Estoppel (5 Ed.), citing *Brightman v. Hicks,* 108 Mass., 246; *Langorn v. Sankey,* 55 Iowa, 52; *Shurman v. Eastin,* 47 Ark., 351; *Klink v. Kudbel,* 37 Ark., 304, authorities which fully support the text.

It may be well to note that the feature of the restrictive stipulation which makes the value at the place of shipment the basis for adjustment in case of loss or damage is not presented for consideration, as the plaintiff's counsel admitted on the argument that the value at the place of shipment should constitute such basis, and the court directed the jury to accept and act upon such valuation in considering the case. Here, as in other features of these restrictive contracts, the cases are in conflict. Hutchinson on Carriers, sec. 430, the author stating, however, that the weight of authorities favors the validity of such a stipulation, and the writer, speaking for himself, is inclined to the opinion that such a provision is a reasonable one and should be upheld, affording, as it does, data for adjustment ordinarily more reliable and more easily obtained.

On the whole matter, we are of opinion, and so hold, that the damage done having been occasioned by the carrier's negligence, the defendant is responsible for the actual loss as ascertained by the verdict, and that the stipulations of the agreement by which defendant seeks to restrict the value as a basis for adjustment at $75 is in contravention of public policy and void.

We note, however, that the court instructed the jury in effect that they could add to the damage done the mare the $56.50 paid for transportation and feed, and it is apparent that the jury have followed the instruction and added this amount to their estimate. As the mare was received at Waynesville, and the animal as valued at that point is owned and possessed by plaintiff, it would seem that the charges for getting her to Waynesville is included in such value, for it would cost as much to transport the animal in the one case as the other. The ver-

STRINGFIELD v. RAILWAY.

dict will, therefore, be modified by reducing same by this $56.50, and, so reduced, the verdict and judgment will be affirmed.

Modified and affirmed.

CLARK, C. J., concurring: The Hepburn amendment to section 20 of the Interstate Commerce Act (U. S. Comp. Stat. Supp. 1907, p. 906) provides that the initial carrier is liable for any loss, damage or injury to the goods caused by it or any connecting carrier, and makes void any contract, receipt, rule or regulation which attempts to exempt the carrier from this liability. 12 Ann. Cases, 1133, and cases cited. In R. R. v. Crenshaw, 5 Ga. App., 675, it is held that the State courts have jurisdiction of an action arising under the Hepburn Act, and that any limitation of value or preadjustment of damages by a stipulation restricting the recovery of damages to an amount less than the actual loss caused by the carrier's negligence, is void under this act. To same effect, Latta v. R. R. (U. S. C. C. A.), 172 Fed., 850. Under these decisions the doctrine laid down in Hart v. R. R., 112 U. S., 331, is reversed by the Hepburn Act, which restores in its integrity the common-law rule that a common carrier cannot contract to be relieved in whole or in part from liability for damages caused by its negligence. The Pennsylvania Court in Grogan v. Express Co., 114 Pa., 523, 60 Am. Rep., 360, even prior to the Hepburn Act, refused to follow the decision in Hart v. R. R., supra, and many other courts of repute did the same; and it may be said with some confidence that the best legal thought of the country sustained them. The effect of the Hart case, supra, if unreversed, would have been to place the business interests of the country in the power of the common carriers, for the shipper cannot contract on equal terms with them. The law must, as of old, forbid unjust and unequal stipulations in the contract of carriage.

Independent of, and anterior to, the Hepburn Act, it was held that a provision limiting liability to an agreed amount is invalid if the injury was caused by the carrier's negligence. It was so held in England, Alabama, California, Colorado, District of Columbia, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Mississippi, Missouri, New Jersey, North Carolina (McConnell v. R. R., 144 N. C., 90, and cases there cited; Everett v. R. R., 138 N. C., 68). Pennsylvania, Tennessee and Texas. See cases collected 12 Ann. Cas., 1131-1133.

BROWN, J., dissenting: I regret always to differ with my brethren, and frequently yield my judgment to the majority,

but, with entire deference, it appears to me that their conclusion in this case is at variance with all of our own adjudications on the subject, as well as other recognized authorities.

The admitted facts are that plaintiff's agent tendered to defendant at New Orleans for shipment to Waynesville, N. C., a mare of great speed, standard-bred and claimed by plaintiff to be worth at least $1,000. A few days before shipment plaintiff had paid $450 for her. When calling for bill of lading plaintiff's agent said nothing whatever about the real intrinsic value of the mare, and there is not even a suggestion that defendant's agent had any knowledge thereof. It is not claimed that he could have acquired such knowledge by mere observation. The mare was received as an ordinary animal, and a bill of lading issued and accepted by plaintiff's agent without demur or objection, fixing the value of the animal at $75 and containing this paragraph: "And which amounts, it is agreed, are as much as such animals, as are herein agreed to be transported, are reasonably worth." In consequence of such valuation the plaintiff received a much lower rate of freight than he would have received had the true value of the animal been given. There was delay in delivering the mare at Waynesville, and when delivered she was in a damaged condition. Plaintiff sues for damages, fixing them at $800. The jury assessed the damages at $356.50.

In apt time the defendant requested, in writing, the court to instruct the jury: "That if the shipper declared the value of the mare and the carrier accepted the same in good faith as the real value, and the freight rate was based thereon, then the stipulation is valid and binding upon the plaintiff, and the plaintiff is now estopped to claim a greater amount than the agreed valuation in the contract." This request was refused, and defendant excepted.

I agree fully with the general principle declared in *Everett's case,* 138 N. C., 71, that a common carrier cannot be permitted to contract against loss occasioned by its own negligence. That is the law as declared by this and many other courts of this country, and is founded upon a sound principle of public policy.

Nevertheless, those tribunals, including our own, which stand by that principle hold that common carriers may contract with their patrons in reference to the value of live stock offered for shipment, and where the value is reasonable for that species of property, it will be upheld.

This is the law as repeatedly decided by this Court. *Selby v. R. R.,* 113 N. C., 588; *Mitchell v. R. R.,* 124 N. C., 246; *Gardner v. R. R.,* 127 N. C., 293. This rule is approved and recognized in the *Everett case, supra,* clearly decided in *Jones*

*v. R. R.,* 148 N. C., 581, and as late as last term reiterated in *Winslow v. R. R.,* 151 N. C., 250. In *Jones v. R. R.* we held that "A voluntary agreement by the shipper with the carrier, in consideration of a reduction in the rate of freight, that the valuation should not exceed $100 per head, is valid as fixing, in good faith, a stipulated and reasonable value for the species of property of uncertain value, concerning which, in case of loss, the carrier would be without evidence."

Again, in the case of *Winslow Bros., supra,* we held: "A stipulation in a bill of lading for the carriage of live stock, that, in case of loss, the liability of the carrier should not exceed $100 per head, made in consideration of reduction in freight rate, is valid."

In *Everett's case, Mr. Justice Hoke,* speaking for a unanimous Court, said: "Such agreements are upheld where the carrier, being without knowledge or notice of the true value, the parties agree upon a valuation of the particular goods shipped approximating the average value of ordinary goods of like kind, and make such valuation the basis of a just and reasonable shipping rate."

In the *Jones case, supra,* in his concurring opinion the same justice repeats with approval the above, and says: "This rule is particularly applicable to shipments of stock in quantities, and eminently just to both parties to such contracts, affording to the shipper a fair and reasonable shipping rate and protecting the carrier from exorbitant and unconscionable recoveries by reason of excessive valuations which it had no opportunity to ascertain or to resist successfully, and for which it has received no adequate compensation. But to permit or uphold such a contract, when the loss arises from negligence, all the conditions suggested must exist. The carrier must be without knowledge or notice of the true value; the valuation must be the fair average valuation of property of like kind, and it must have been made the basis of a fair and reasonable shipping rate."

It appears to me that the words of my learned brother are peculiarly applicable to this transaction, and that counsel had the printed page before them when they framed the prayer for instructions. It would seem that, if the standard fixed by him in the *Everett case* be applied to the facts of this case, the plaintiff should be held to his contract, and permitted to recover no more than the value his agent accepted.

1. The parties agreed upon a value, which is plainly stated in the bill of lading so that plaintiff's agent could read it. He knowingly accepted the written contract with that stipulation in it, and refrained from stating to defendant's agent the true value of the mare. It is elementary learning that one who

accepts a written contract and acts under it is fixed with knowledge of its provisions and is bound by them. Upon this principle the plaintiff, who by his agent accepted this bill of lading, is deemed to have been cognizant of its stipulations and to have agreed to them.

2. The carrier's agent was without knowledge or notice of the true value of the mare. There is not a suggestion in the record that the defendant's agent at New Orleans knew anything about the mare, that distinguished her from ordinary animals of the horse species.

We know from every-day observation and experience that the true value of a standard-bred racing horse is not apparent from mere inspection. Neither his pedigree nor record is apparent on the face of the animal. To the non-expert nothing is more deceptive than horseflesh. According to equine history, some of the most noted kings and queens of the trotting track and the turf have been very ordinary looking animals. The renowned Dexter in his earlier days is said to have sold for a very insignificant sum, and tradition says that the great Boston was an ordinary looking animal. The famous Godolphin Arab, whose descendants have been the glory of the English turf, pulled a scavenger's cart through the streets of Paris, and was sold for a mere song to the English nobleman whose name has been handed down to posterity because he gave it to this peerless Son of the Desert.

It was no difficult matter, therefore, to palm off on defendant's agent this $1,000 trotter for an ordinary horse such as is shipped by railways almost every day in the year. It was not necessary to make any verbal misrepresentation in order to deceive. The agent of the plaintiff was guilty of a legal and moral fraud which should not be tolerated much less rewarded, when he accepted a shipping contract at a valuation of $75 for a $1,000 mare, and kept his silence when he should have spoken, in order to get a much reduced freight rate. Having gotten the rate, through the conduct of his agent, the plaintiff, although personally innocent, should be held to the contract made for him.

3. The valuation placed upon the mare in the contract is the average value of ordinary horses, such as the agent had the right to suppose plaintiff's mare to have been.

Common observation, in the absence of any evidence, should be sufficient to convince us that this value of $75 is not merely nominal, and not intended as an evasion of defendant's liability as a carrier. It is an average value for horses that are shipped by thousands over the railroads of the country, and if the tax books could be examined it would be seen that it is

greater than is placed upon the average farm horse by tax assessors. I doubt if the mare in question would have brought much more than that at a public sale in a community that knew nothing about her.

4. The valuation, according to the terms of the written contract, was made the basis of a reduced shipping rate. It stands to reason that the carrier would charge and should receive much more for transporting a $1,000 race horse than for a $100 animal. *Gibbon v. Paynton,* 4 Burrows, 2298; *Batson v. Donovan,* 4 B. & A., 21; *Hart v. R. R.,* 112 U. S., 339-343.

I think I have demonstrated that, judged by the standard so recently fixed by *Mr. Justice Hoke,* and guaged by the four tests laid down by him, this transaction has every element necessary to constitute a valid shipping contract, which should be upheld.

The application of the rule should not be made to depend upon the number of animals shipped. The very reason upon which the rule is founded forbids it.

The principle upon which the ruling is based is that ordinary shipments of goods and merchandise disclose their approximate value, and the carrier's agent by inspection can learn it, but that, in respect to horses and live stock generally, their value cannot be determined by ordinary inspection, and therefore the carrier, being without evidence as to their true value, has the right to protect itself against exorbitant and fictitious values by agreeing upon a value in the contract of shipment itself. This is a most reasonable and just rule, and if ever there was a case where the contract should be upheld, this, in my opinion, is one. To no case can the words of an impartial and able judge be more applicable than those of the late *Chief Justice McIver* are to this: "But when, as in this case, the shipper has obtained an advantage, in consideration of which he has fixed the value of the property shipped, the case becomes still stronger. The shipper having reaped the advantage obtained by the special contract, must, as a matter of common justice, bear the burden which such contract imposed." *Johnston v. R. R.,* 39 S. C., 61. I am advertent to the fact that the mare was not shipped by the plaintiff in person, but however innocent of intentional wrong he admittedly is, in law he is bound by the acts of his agent, who shipped the mare for him.

I am of opinion that the trial judge should have given the defendant's prayer for instruction, which I have quoted above.

WALKER, J., concurring in the dissenting opinion.